GOLD BENNETT CERA & SIDENER LLP
SOLOMON B. CERA (State Bar No. 99467)
THOMAS C. BRIGHT (State Bar No. 169713)
LOUIS A. KESSLER (State Bar No. 243703)
595 Market Street, Suite 2300
San Francisco, California 94105
Tel: (415) 777-2230
Fax: (415) 777-5189
E-mail: scera@gbcslaw.com
E-mail: tbright@gbcslaw.com
E-mail: lakessler@gbcslaw.com

Attorneys for Lead Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE VERIFONE SECURITIES LITIGATION | Case No.: 13-cv-01038-EJD<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs, through their attorneys, bring this action on behalf of themselves and all others similarly situated, and allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on, *inter alia*, the investigation of Lead Plaintiffs' counsel. This investigation has included, among other things, a review and consideration of: (1) public filings by defendant VeriFone Systems, Inc. ("VeriFone" or the "Company") with the Securities and Exchange Commission ("SEC"); (2) public announcements made by VeriFone; (3) newswire and press releases issued by and regarding the Company; (4) securities analysts' reports and advisories about the Company; (5) transcripts of securities analysts' conference calls with VeriFone senior management; (6) articles in the general and financial press; (7) information obtainable on the Internet; (8) consultation with experts; and (9) witness interviews. The investigation of Lead Plaintiffs' counsel into the factual allegations contained herein is continuing. Lead Plaintiffs believe that substantial additional evidentiary support for the allegations set forth herein will be uncovered after a reasonable opportunity for discovery.

## I.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a Class consisting of all persons, other than Defendants, who purchased or otherwise acquired the publicly-traded common stock of VeriFone between December 14, 2011 and February 20, 2013, inclusive (the "Class Period"). The allegations arise from material misrepresentations and omissions disseminated to the market by defendants VeriFone; Douglas G. Bergeron, its Chief Executive Officer ("CEO") and member of the Company's Board of Directors at relevant times; and Robert Dykes, its Chief Financial Officer ("CFO") and Executive Vice President at relevant times. The claims asserted are brought to remedy violations of Sections 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2. VeriFone holds itself out as a leading provider of technology and services that enable secure electronic payment transactions and value-added services at the point of sale

("POS"). The Company has approximately a 40% global market share of stand-alone POS terminals. The Company's customers include financial institutions, payment processors, petroleum companies, large retailers, taxi fleets, transportation agencies, government organizations and healthcare companies, quick service restaurants, advertisers and media companies. Demand for VeriFone's core products and services has been driven by the shift to electronic payments in emerging markets, and data security and technological advancements in established markets.

3. On April 4, 2011, VeriFone announced a major transaction, *i.e.* the completion of its acquisition of Hypercom Corporation ("Hypercom"), at the time VeriFone's second largest competitor. This acquisition came on the heels of a separate acquisition which led to the public exposure of material accounting and internal control deficiencies at the Company, and revelation of a culture, encouraged and fostered by defendant Bergeron, of "hitting the numbers" at any and all cost, regardless of compliance with accounting rules and regulations. The story of VeriFone, during the era of Bergeron's control, was to do anything and everything necessary to maintain the image of VeriFone in the eyes of Wall Street and the market as a continuing and unmitigated "growth" and success story. The Company made accounting misstatements in 2007 related to the acquisition of Lipman Electronic Engineering Ltd. ("Lipman"). The accounting issues led to a restatement of financial results and were the basis for a complaint filed by the SEC against VeriFone in September 2009. *Securities and Exchange Commission v. VeriFone Holdings, Inc., et al.*, Case No. CV 09-4046 RS (N.D. Cal. Sept. 1, 2009) (the "SEC Action"). The SEC Action and the evidence adduced therein revealed the reckless accounting practices of VeriFone and the willingness to "do anything" to make quarterly numbers. Lead Plaintiffs' investigation through counsel has revealed that this culture of indifference to accounting rules and full disclosure of all material facts continued to exist throughout the Class Period at issue in this case. On November 12, 2009, VeirFone consented to the entry of a final judgment against it in the SEC Action. Specifically, VeriFone consented to a permanent injunction against violations of the reporting, internal controls, and other relevant provisions of the federal securities. The conduct alleged

herein constitutes a violation of the permanent injunction entered against VeriFone in the SEC Action.

4. During the Class Period, VeriFone carefully constructed an image as a Company achieving steady and consistent growth. In order to cultivate this image, Defendants made a series of false and/or misleading statements regarding its growth and revenues, while failing to disclose, among other things, that: (i) the Company failed to execute on its plan to move to a more subscriptions-based service model; (ii) it was not adequately investing in product Research and Development ("R&D") in its hardware POS products to permit it to gain approval for its products and market share in the crucial emerging markets segment, which represented VeriFone's best opportunity to achieve the top line growth it consistently represented it could achieve; and (iii) the Company engaged in improper revenue recognition practices. As a result of the above, the Defendants made materially false and misleading statements to the market during the Class Period.

5. On March 11, 2013, defendant Bergeron unexpectedly announced his resignation as CEO and Board member effective immediately. Bergeron had been the only CEO of the Company since its founding in 2002. Bergeron was forced out by the Board in light of his having lost all credibility with the Wall Street analyst community, based on the Company's failure to meet its revenue guidance, amid recurring accounting questions being raised regarding the Company's revenue recognition practices and hyper-aggressive forecasts and incessant cheer leading, which could not be backed up with actual results.

6. On February 4, 2013, the Company announced the retirement of its then Chief Financial Officer, defendant Dykes. Dykes was forced out by the Board for the same reasons that compelled Bergeron's departure. On the February 4 announcement, VeriFone stock declined $0.87 per share or nearly 2.5%, to close at $34.37 per share.

7. On February 20, 2013, the Company disclosed its preliminary financial results for the first fiscal quarter ended January 31, 2013. The Company announced that it expected its first quarter-adjusted earnings to be approximately $0.47 to $0.57 per share on revenue of $424 million, falling well below the Company's prior guidance and analysts' expectations of $0.73 per

share on revenue of $492 million. VeriFone attributed these disappointing results to a litany of reasons, including (i) purported weakness in European demand; (ii) inability to customize/localize its products as investments went into service initiatives, (iii) revenue recognition issues in the Middle East/Africa, (iv) lower than anticipated Brazilian and Venezuelan revenue; and (v) delay in certain large contracts such as one covering Washington D.C. taxi service.

8. On this news, shareholders hammered VeriFone's share price, causing it to spike downward by $13.65 per share or nearly 43%, to close at $18.24 per share on February 21, 2013.

9. Analysts immediately voiced skepticism regarding VeriFone's multiplicity of explanations for the Company's unexpectedly disappointing results. With respect to European macroeconomic conditions cited by the Company, analysts noted that such conditions had a far less substantial impact on VeriFone's competitors, NCR Corp. and Micros Systems. Moreover, several analysts suggested that the cause for the dramatic revenue shortfall was missed hardware and software opportunities due to increased focus and investments on longer-term services initiatives at the expense of upgrades and certifications in POS models, *i.e.* an inability to execute on the changing business model from hardware sales to bundled software packages. The consensus of the analyst community was that VeriFone's explanations for its surprisingly disappointing results were pretexts for larger issues concerning how the Company was being managed and exposed unreliability in the representations of senior management regarding the true status of the Company's business. Because of Defendants' wrongful acts and omissions, as alleged herein, which caused the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant damages.

## II.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

11. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

12. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as VeriFone's principal place of business is located within this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## III.

## PARTIES

14. Lead Plaintiffs, the Selz Family 2011 Trust, Karnak Partners L.P., Ermitage Selz Fund Ltd., GAM Selection Hedge Investments Inc., and Bernard Selz ("Lead Plaintiffs") purchased VeriFone common stock during the Class Period as set forth in the Certification previously filed with the Court and attached hereto, and sustained damages as a result of the violations of law alleged herein. On October 7, 2013, the Court appointed Lead Plaintiffs in this action pursuant to Section 21D of the Exchange Act, 15 U.S.C. §78u-4. This is the first complaint filed in this action by the Lead Plaintiffs.

15. Defendant VeriFone is a Delaware corporation with its principal executive offices located at 2099 Gateway Place, Suite 600, San Jose, CA 95110. VeriFone was founded in 1981. It entered the U.S. securities market through an initial public offering ("IPO") on May 4, 2005. At all relevant times, the Company's stock was actively traded on the New York Stock Exchange ("NYSE") under the ticker symbol "PAY." For accounting purposes, VeriFone uses a November to October fiscal year that ends on October 31. Thus, its first quarter for fiscal year 2014 began on November 1, 2013.

16. Defendant Douglas G. Bergeron ("Bergeron") at all relevant times was the Company's CEO and a director. Bergeron served as VeriFone's CEO and director since its

formation in July 2002 until March 11, 2013, when he announced his resignation as CEO and Board member effective March 12, 2013.

17. Defendant Robert Dykes ("Dykes") was the Company's CFO and Executive Vice President at all relevant times until his retirement was announced by VeriFone on February 4, 2013. Dykes joined VeriFone as Senior Vice President on September 2, 2008, and was named CFO on September 9, 2008. Dykes was named Executive Vice President in August 2011.

18. The defendants referenced above in ¶¶16-17 are sometimes referred to herein as the "Individual Defendants."

19. During the Class Period, each of the Individual Defendants, as senior executive officers, agents, and/or directors of VeriFone, was privy to non-public information concerning the Company's business, finances, products, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and through reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

20. The Individual Defendants participated in the preparation, approval, and/or dissemination of the various public, shareholder, and investor reports and other communications complained of herein, including with the analyst community. The Individual Defendants were aware of, or recklessly disregarded, misstatements and omissions complained of herein, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with VeriFone, each of the Individual Defendants had access to the adverse undisclosed information about VeriFone's financial condition and performance. The Individual Defendants therefore knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about VeriFone materially false and misleading.

21. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to (and in fact did) control the content of the Company's quarterly and annual financial reports, SEC filings, press releases and presentations to securities analysts pertaining to VeriFone and its financial condition and/or performance. The Individual Defendants had the power and influence, and exercised the same, to control the disclosures made by the Company, including to the analyst community.

22. The Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to VeriFone's financial results, operations, and/or future business prospects or to cause and direct that such information be disseminated so that the market price of VeriFone's common stock would be based on truthful and accurate information.

23. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, status and impact of its growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects. This duty also arose from the order of permanent injunction entered against VeriFone in the SEC Action. The Individual Defendants also had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations, including the order of permanent injunction in the SEC Action.

24. Each of the Individual Defendants knew or was reckless in disregarding the fact that the misleading statements and omissions described herein would adversely affect the integrity of the market for VeriFone common stock and would artificially inflate or maintain the price of VeriFone common stock. The actions and/or inaction by the Individual Defendants were the proximate cause for the artificial inflation in the price of VeriFone common stock during the

Class Period and the resultant damages sustained by Lead Plaintiffs and the members of the Class.

25. VeriFone and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of VeriFone common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme, among other things, (i) deceived the investing public regarding VeriFone's transitioning business model, organic revenue growth, illegal sales to Iran, deterioration of its distribution network, premature revenue recognition, the adequacy of its R&D investment, and the intrinsic value of VeriFone common stock; and (ii) caused Lead Plaintiff and other members of the Class to purchase VeriFone common stock at artificially inflated prices and to sustain damage upon the disclosure that marks the end of the Class Period.

## IV.

## BACKGROUND

### VeriFone's Business

26. According to its Annual Report on Form 10-K for the fiscal year 2012 ending October 31, 2012, filed December 19, 2012, VeriFone is a leading global provider of payment solutions that enable secure electronic payment transactions and value-added services at the point of sale ("POS"). The Company provides payment solutions and expertise at the POS via merchant-operated, consumer facing, and self-service systems for, among others, the financial, retail, hospitality, petroleum, transportation, government, and healthcare markets. The Company's payment solutions consist of POS electronic payment devices that run its proprietary and third party operating systems, security, encryption, application, and certified payment software as well as other value-added applications. VeriFone's payment solutions are able to process a wide range of payment types, including signature and PIN-based debit cards, credit cards, contactless or radio frequency identification ("RFID") cards and tokens, near field communication ("NFC'') enabled mobile phones, EMV (Europay, MasterCard and VISA) based payment cards, prepaid gift and other stored-value cards, electronic funds transfer ("EFT"), check authorization and conversion, signature capture, and electronic benefits transfer ("EBT").

27. VeriFone claims to design its payment solutions to meet the demanding requirements of its customers. The Company's payment systems are available in several modular configurations, offering its customers flexibility to support a variety of connectivity options, including various wired and wireless Internet connectivity infrastructures deployed globally.

28. As of the end of the Class Period, approximately 40% of VeriFone's Research and Development ("R&D") expenditures targeted product customization and localization to meet the needs of certain in-country specifications. This includes spending on local applications, local bank interfaces, government-imposed country-specific modifications, securities technologies customized for specific market requirements, and the certification of each new iteration. Another 40% of VeriFone's R&D exependitures was spent on platform development. The remaining 20% is invested in gateway development, software applications, systems for managed services and requirements for the Company's services transformation.

29. During the Class Period, VeriFone touted that its services were an increasingly important part of its overall revenue mix. These services included those thought to be the more traditional services that span different aspects of the payments ecosystem, including equipment repair and maintenance, gateway processing, remote terminal management, software post-contract support, customized application development, helpdesk services, customer service, warehousing and encryption or tokenization. VeriFone also offered full-service solutions, such as Point's "All in One" payment solution (also referred to as "Payment-as-a-Service"), as well as end-to-end estate management services. Additionally, the Company offered market-specific services such as GlobalBay mobile retailing software, LIFT retail services deployed at gas stations and convenience stores, and digital media solutions, which utilize media-enabled equipment to display digital content, such as VNET (VeriFone digital network), in taxis and at gas station petroleum dispensers. Also included were customer technical support for installed payment systems, consulting and project management services for system deployment, and customization of integrated software solutions.

30. Since becoming a public company in May 2005, VeriFone has grown both organically and through the following material acquisitions:

a. Lipman Electronic Engineering Ltd. ("Lipman"), a provider of electronic payment systems headquartered in Israel, was acquired in November 2006.

b. Certain business assets and liabilities of Gemalto N.V.'s e-payment terminals and systems business unit, which primarily serviced customers located in the Middle East, South Africa, and India was acquired on December 2010.

c. All of the outstanding shares of Destiny Electronic Commerce (Proprietary) Limited, which traded as CSC, were acquired in June 2011. CSC was previously one of VeriFone's distributors. CAC brought to the Company payment technologies, services, and solutions at the POS for banking, retail, and petroleum, providing value-added services and end-to-end estate management services and tools in Sub-Saharan Africa and the Indian Ocean islands. VeriFone also gained CSC's range of software applications for compliance with card industry specifications and standards.

d. Hypercom Corporation ("Hypercom"), a global provider of electronic payment solutions and value-added services at the POS to, among others, banks and other financial institutions, processors, large scale retailers, smaller merchants, quick service restaurants, and users in the transportation, petroleum, healthcare, prepaid, and self-service markets, was acquired in August 2011.

e. Global Bay Mobile Technologies, a U.S.-based provider of next-generation mobile retail solutions and applications that leverage existing POS, e-commerce, and traditional store systems in the retail environment, was acquired in November 2011.

f. Electronic Transaction Group Nordic Holding AB ("Point"), previously one of the Company's distributors and Northern Europe's largest provider of payment and gateway services and solutions for retailers, was acquired in December 2011.

g. ChangeSmart Smart Inc. ("ChangeSmart"), a provider of online payment solutions for consumers and billers was acquired in January 2012.

h. LIFT Retail Marketing Technology, Inc. ("LIFT"), a provider of a digital marketing system that integrates with retail POS systems in the convenience store and petroleum markets was acquired in March 2012.

31. VeriFone's sources of net revenue during the Class Period include:

a. products, which include the sale or lease of electronic payment systems with incidental software or accessories;

b. services, which include the "All-in-One" payment services, fees for installation and deployment, customer support, repair services, transaction processing, custom software development and extended warranties, as well as advertising (or "placement") in and on taxis and displays at petroleum dispensers; and

c. software, which includes licenses for software to manage electronic payment solutions and encryption, enable mobile payment and provide value-added features to payment solutions.

32. For reporting purposes, VeriFone divides its net revenue into two categories:

a. System solutions net revenues which refer to net revenues from products and associated perpetual software licenses and accessories;

b. Services net revenues which refer to net revenues from services, equipment leases and term software licenses.

## V.

## DEFENDANTS' KNOWING AND/OR RECKLESS CONDUCT DURING THE CLASS PERIOD

33. Lead Plaintiffs' allegations regarding knowing or reckless material misrepresentations and omissions made by Defendants during the Class Period are supported by information gleaned from confidential witnesses ("CW"), securities analysts, and revelations made by the Company at the close of the Class Period, among other sources.

### A. VeriFone Prematurely Recognized Revenue

34. Information obtained from confidential witnesses establishes that senior executives at VeriFone, including Defendant Dykes, knew during the Class Period that the

Company's aggressive accounting approach to revenue recognition was inappropriate, yet nonetheless directed that revenue be improperly recorded in an ongoing attempt to "hit the numbers."

35. According to the Finance Controller for VeriFone from December 2010 to March 2013 (CW10), she was under extreme pressure from Dykes in particular to recognize revenue prematurely. CW10 was one of several Finance Controllers who were responsible for the finances of the Company's business units. CW10 was responsible for all aspects of the financial reporting for the taxi and advertising units in the U.S. and U.K, including completing the monthly accounting close process for these units.

36. CW10 stated that the Company had a department responsible for reviewing contracts and making revenue recognition recommendations to the Finance Controllers such as herself. "On paper, it looked like you had independence" for purposes of the revenue recognition responsibility, CW10 said, but the reality was otherwise. The reality, according to CW10, was that the revenue recognition team had little power and no responsibility to make the final revenue recognition decisions which were directed from senior officers, including Dykes.

37. CW10 described the line of reporting and the Company's policy of supposedly giving the Finance Controllers responsibility for revenue recognition decisions as problematic because her boss reported to the General Managers in charge of the financial performance of each business unit, which in turn subjected CW10 to pressure from above to make decisions that were against her judgment as a CPA and that contradicted GAAP accounting rules. "Their internal control structure is not set up correctly," CW10 said.

38. Throughout 2012, CW10 experienced "extreme pressure" from Defendant Dykes to "book revenue when I knew it wasn't revenue" under GAAP accounting rules. Defendant Dykes would e-mail CW10 directly, instructing CW10 to improperly recognize certain amounts of revenue from the taxi and advertising units. CW10 tried to resist Dykes' efforts to recognize revenue prematurely or improperly. When CW10 would resist Defendant Dykes' directives, he would send her emails, saying: "Are you going against the CFO?" CW10 effectively felt threatened and bullied by Dykes to contravene her own best judgment about revenue recognition

matters. These type of exchanges occurred regularly during 2012. CW10 said: "It was blocking and tackling those kinds of things on a regular basis." These interactions made her extremely uncomfortable. "I had to go up against the CFO," CW10 said. "It was so horrible you can't imagine."

39. Despite CW10's resistance to improperly recording revenue from particular deals, "I was told by my boss' boss to just book it," CW10 recalled. "I was forced to book revenue when it wasn't revenue," CW10 said. "It was wrong." In response to the pressures placed upon her, on some deals, CW10 gave in and said: "Ok fine, then I'm not going to sign the financial statements," meaning the SOX compliance documents.

40. CW10 said there were numerous transactions that Dykes insisted be booked to help the Company meet its forecasts to Wall Street in 2012. For example, VeriFone purchased a company Called TaxiTops in 2011 and Defendant Dykes, according to CW10, wanted to recognize the assets and revenue from that deal in a way that violated GAAP accounting rules. Again, CW10, a Finance Controller, disagreed with Defendant Dyke's insisted-upon method of revenue recognition for the deal including revenues from advertising on top of the taxis and Dykes responded: "Are you disagreeing with your CFO?"

41. CW10's experiences were not unique. Based on CW10's conversations with other finance controllers, revenues were prematurely recognized on deals "peppered throughout" the Company's business units in 2012.

42. On a weekly basis, CW10 participated in conference calls between the finance department in Clearwater, Florida and the executives at VeriFone's headquarters in California. Other Finance Controllers, her boss and the company's top executives, including Dykes, reviewed the deals from the Company's business units that were being recognized as revenue in that quarter. CW10 recalls CEO Bergeron attending one of the conference calls in 2012. When Bergeron looked at the numbers, which failed to meet the Company's forecasts, "he walked out of the room," CW10 said. On these quarterly conference calls with Defendants Bergeron and Dykes, and other executives, the executives told her and other finance controllers: "You need to

find another $5 million or another $8 million" to book as revenue. The controllers attempted to find revenue to book that they could "try to justify."

43. In an effort to improve the Company's top line, CW10 said Defendant Dykes implemented an accounting change that allowed VeriFone to recognize the "gross revenues" from the transactions from the taxi business rather than just recognizing the "net revenues." "This happened at the end of a quarter," CW10 said. "That increased revenue by millions of dollars." The gross amount included credit charge processing fees that were ultimately paid to other vendors involved in the transactions. The company flip-flopped its accounting policy on this matter according to CW10 and on other matters frequently, and the accounting and revenue recognition policies from one unit to the next were not consistent. "We had significant inconsistencies across the units of the company," CW10 said. "It was just a mess."

44. CW10 said the Finance Controllers were always under pressure to book revenue to show 10% to 15% growth. CW10 saw how the Company was trying to manipulate its revenue recognition practices on particular deals in order to meet its forecasts to Wall Street. "They were doing everything they could to make their numbers at the end of the quarter," CW10 said.

45. Asked why Dykes left the company, CW10 said he was fired.

46. Confirming CW10, a Senior Consolidations Accountant (CW1), who worked at VeriFone from February 2012 to April 2013, stated revenue was being improperly recognized for many accounts because there was no "completion" of a transaction before revenue was recognized. "Completion" for accounting purposes had been reached when all of the following events occurred, with the risk of loss passing to the customer and all of these criteria being met: (i) there is persuasive evidence that an arrangement exists; (ii) delivery of the products or services has occurred; (iii) the selling price is fixed or determinable; and (iv) collection is reasonably assured and not contingent upon future performance.

47. In early April 2013, CW1 was told by the Revenue Controller that she (the Revenue Controller) was involved in a dispute with her superior, Vice President Accounting and Reporting. The dispute involved the revenue recognition for product being sold to smaller customer accounts (accounts generating annual revenues of ~$200,000). The Revenue

Controller told CW1 that revenue was being recognized prior to completion, and that she told her supervisor that this was not the appropriate way to recognize this revenue. Even though the Revenue Controller was certain she was correct, her position was rejected and revenue was improperly recorded. CW1 said that the Senior Vice President and Corporate Controller was aware of the dispute and the ongoing practice of prematurely recognizing revenue in these customer accounts. CW1 stated Defendant Dykes, the Controller's supervisor, was also aware of the dispute and its resolution resulting in improper recording of revenue.

48. In July 2013, CW1 had lunch with two VeriFone employees who told CW1 that the Vice President Accounting and Reporting had demoted the Revenue Controller shortly after the dispute.

49. An interview with a Senior Director of Sales of Hypercom in Canada from August 2010 to August 2012 (CW2) further confirms that VeriFone prematurely recognized revenue in order to meet the aggressive revenue forecasts of senior management. CW2 stated that it was widely known throughout the industry that VeriFone was able to hit Defendant Bergeron's lofty sales goals only by "channel stuffing" at the end of quarters and asking customers to sign a purchase order or sales contracts at that point. CW2 said that he heard about the practice through his channel partners, Independent Sales Organizations ("ISO") and resellers whom he and VeriFone both sold to during the Class Period. These customers included First Data Canada and TASQ Technology, Inc. CW2's customers told him that they were asked by VeriFone managers to send in sales orders and contracts at the end of quarters so that VeriFone could hit the quarterly numbers promised to investors. VeriFone recognized the revenue from these end-of-quarter deals even though the customers had not received the shipment of VeriFone's products.

**B. VeriFone Failed to Disclose Its Failure in Transitioning Its Business Model**

50. During the Class Period, VeriFone was in the midst of a multi-year business model transition from a hardware replacement cycle business, to one of recurring service revenues based on payment-as-a-service ("PaaS"). This process included acquiring certain PaaS companies, such as Point. Throughout the Class Period, and during a time when roughly 70% of

the Company's revenues were generated from unit sales, senior management knew or were reckless in not knowing that during this transition, capital expenditures previously devoted to hardware R&D were being cannibalized and directed to PaaS. This dramatic shift in R&D spending caused VeriFone to face supply chain and inventory problems that ultimately led to its massive miss in revenue guidance as revealed at the end of the Class Period. Yet not until after this miss was announced did the Company admit to these realities, confirming that it over-emphasized PaaS to the detriment of its core hardware business, and as a result would significantly increase R&D investment. The Company never disclosed to its public investors that it was about to experience several quarters of lowered profitability as it attempted to get to the right mix of hardware products and services to maximize profitability.

51. After the February 20, 2013 announcement, analysts expressed their disbelief that VeriFone previously was forecasting a business model transition without revenue disruption. "The problem is making a business-model transition of that magnitude as a public company…is virtually impossible," analyst Andrew Jeffrey of SunTrust Robinson Humphrey said. "At least, it's impossible to do without material disruption."

52. The material disruption VeriFone was shielding from investors was apparent to the Vice President, International Controller from August 2012 to May 2013 (CW3). He noted that in 2012 and the start of 2013, the Company struggled to meet its financial forecasts in part due to the fact that the sales of hardware products would generate revenue that would be recognized immediately while monthly subscription fees had to be recognized ratably over time. CW3 said the challenge to meet the forecasts promised to investors was further exacerbated by the fact that while the business model transition was underway, the price of VeriFone's hardware products was significantly declining, as they became increasingly commoditized. For example, a hardware product that once sold for $1,000, sold for only one eighth of that price by the time he left the Company. It was clear to CW3 that VeriFone faced significant challenges in its transitioning to a subscription based model. The market was never fully informed as to the effect this was having on the Company's financial results.

53. The serious issues raised by the failed business transition were equally clear to an Independent Sales Organizations ("ISO") channel sales representative from April 2011 to August 2012 (CW4). CW4 was part of part of a three person team responsible for selling VeriFone products and services to ISOs. CW4 stated that the transition to the subscription based model had not taken off because it was flawed. "I don't think it went well. Why would anyone pay that when Square offered its device for free and its fees for much less?" CW4 felt he was under tremendous pressure to make his sales goals that were continually increasing due the senior management's making increasingly ambitious revenue projections. Yet in the spring and summer months of 2012 sales decreased, particularly in the mobile device unit.

54. Vice President and General Manager of VeriFone's North American Financial Group from December 2010 until September 2012 (CW5) verified the business model transition was not proceeding as had been represented to investors. He said that the Company's transition was going slower than the senior executives had hoped and the clients were slow to agree to pay the monthly subscription fees, cutting into revenue.

**C. The Company Failed to Disclose Material Issues That Arose During the Integration and Rationalization of Completed Strategic Acquisitions**

55. Contrary to VeriFone's assurances that the integration of its acquisitions was proceeding without significant problems, the Company experienced greater than expected revenue attrition, supply chain/manufacturing snafus, difficulties with financial reporting system integration, and delayed cost synergies. None of these adverse facts were fully and adequately disclosed to investors.

56. During 2011 and 2012, and in an effort to geographically grow its products business and generally expand its PaaS business, the Company aggressively pursued major acquisitions, such as Hypercom and Point. The integration of the acquisitions was severely problematic. For example, according to CW1, incorporation of Point's financial reporting system took twice as long as it should have. CW1 was tasked with "mapping" Point's chart of accounts to conform to VeriFone's. She stated that the mapping process should normally be completed in three months. However, it took in excess of six months.

57. In January 2012, VeriFone acquired ChargeSmart, which offered online payment solutions for consumers and retailers. A Senior Vice President and General Manager at VeriFone from March 2012 until February 2013 (CW6), oversaw the rollout of ChargeSmart. CW6 stated that VeriFone purchased ChargeSmart in order to compete with Square in the market for mobile payment systems.

58. Square is a merchant services aggregator and mobile payments company. The Company markets two applications and services, one being Square Register. Square Register allows individuals and merchants to accept debit and credit cards on their smartphone or tablet computer. The application supports swiping the card through the Square Reader, a small plastic device which plugs into the audio jack of a supported smartphone or tablet and reads the magnetic strip.

59. VeriFone developed the SAIL platform through its purchase of ChargeSmart. Like Square, SAIL includes a credit card swipe dongle. SAIL was launched by VeriFone in May of 2012, but only six months later Defendant Bergeron announced that the Company would discontinue SAIL and divest itself of the business in the United States. CW6 said that the SAIL products failed to produce the revenues as VeriFone had represented and, as a result, CW6 oversaw the divestiture of the SAIL business in January 2013. CW6 also stated that while VeriFone retained the bill payment portion of the ChargeSmart business, it did not make a profit or meet VeriFone’s forecasts.

60. CW6 also oversaw the launch of services from the acquisition of Point in December 2011. At the time of the acquisition, Point was Northern Europe’s largest provider of electronic payment services for retailers with 475,000 merchant contracts in 11 European countries. CW6 was in charge of the execution of the sales of the electronic payment solutions to restaurants, hotels, and larger retail chains in the United States. CW6 stated that the bill payment business did not succeed in the United States because VeriFone was competing directly with its own resellers and customers, who had purchased POS systems from VeriFone, such as Bank of America and other banks. CW6 noted that VeriFone “couldn’t execute a real strategy.”

61. Throughout the Class Period, the Company reassured its investors that these acquisitions were being integrated seamlessly. However, Defendants knew or recklessly disregarded that the acquisition integrations were causing materially greater than expected revenue attrition and supply chain and manufacturing difficulties. Not until after the Class Period did VeriFone came clean with investors, finally admitting, among other things, that due to the significant R&D investment that was required for the suite of products inherited from the Gemalto and Hypercom acquisitions, the Company did not invest sufficiently in R&D post-acquisitions. The lack of localized and customized products in France and Germany also contributed to VeriFone losing additional market share.

**D. VeriFone Used Revenue Generated From Acquisitions To Obscure its Organic Growth**

62. Throughout the Class Period, VeriFone used revenue generated from its acquisitions to obscure its true organic growth. On April 30, 2012, Deutsche Bank issued a detailed research report asserting for the first time that VeriFone was inflating its organic growth through acquisitions by treating as "organic growth" the sale of VeriFone products to legacy customers of Hypercom and possibly customers of other acquired companies. In reality, such sales simply cannibalized millions of dollars in Hypercom product sales and did not constitute organic growth.

63. On March 6, 2013, Bryan Keane of Deutsche Bank posited that much of VeriFone's "weaker results can be explained by the anniversary of its large acquisitions where now the true organic growth cannot be masked."

64. On April 2, 2013, Keane stated that he believed most of the issues cited by VeriFone for its missed revenue forecast disclosed on February 20, 2013, including, among others, deficient product development, demand slowdown, deferred shipments and revenue in the Middle East, "existed for several quarters and were masked by the acquisition revenues."

### E. VeriFone Failed to Disclose That Its Middle East Distribution Channels were Disrupted and Not Sufficient to Meet Demand

65. VeriFone experienced a severe disruption in its distribution channels for Africa and the Middle East ("AME") that senior management knew or recklessly disregarded would lead to a deferral in recognizing material amounts of revenue, but failed to warn the investing public of the resulting negative impact on the Company's top line. VeriFone relied primarily on third party distributors to serve its AME business. The Company knew no later than early 2012 that two of its third-party distributors in the AME region likely made unauthorized shipments of certain POS products to Iranian entities or their affiliates, transactions barred by U.S. law. No later than March 2013, the Company learned that one of the third-party distributors was continuing to make unauthorized sales of VeriFone POS terminals to Iranian entities. Following these distributors' terminations in March 2013 as disclosed by the Company, VeriFone replaced their distribution volume with a United Kingdom-based distributor ("UK distributor") and by expanding the business of a United Arab Emirates-based distributor ("UAE distributor") that was already serving VeriFone in the AME region. VeriFone knew that it could take several months or longer to develop a distribution channel, yet failed to warn investors during the Class Period that addressing the disruption in its AME distribution would cause the Company to defer the recognition of $23 million in revenue. Prior to 2013 Q1 and when the Company was realigning its distribution channels, the Company was not deferring but inappropriately recognized revenues from the UK distributor and the UAE distributor.

66. The Iranian sales were discovered by CW3 who noticed a price list for keyboards with language in Farsi, which is spoken in Iran, and brought it to the attention of corporate legal counsel and the Corporate Controller and Senior Vice President. They investigated and discovered that a Middle Eastern distributor had sold VeriFone products into Iran, in violation of U.S. law prohibiting transactions with that country.

67. The Iranian sales were first disclosed by VeriFone when it filed its Form 10-Q for Q1 FY 2013 on March 11, 2013. A Senior Vice President for Southern Europe, Russia, and the Commonwealth of Independent States from 2011 to 2012 (CW7), stated that sales to Iran occurred during the Class Period and were approved by the Company.

**F. The Weakness In European Demand Did Not Cause the Company to Miss Its Guidance**

68. When VeriFone announced it would miss its first quarter guidance on February 20, 2013, one of the factors senior executives cited for the miss was weakness in European demand. Analysts were not convinced. Gil Luria was especially skeptical, pointing out that "the global economy had far less impact on peers NCR, MCRS, and ING.FR." Similarly, in stark contrast to the Company's claims of soft demand, CW7 stated that while he was at VeriFone, there was "steady growth in demand for products in Europe," and he saw "no downturn in demand." Indeed, his region was surpassing its sales targets, and "was one of the best performers of the Company." VeriFone misled the market about the true reasons for its severe revenue miss, in order to mask the underlying fraudulent conduct herein alleged.

**G. VeriFone's Credit Card Processing Software Was An Undisclosed Failure**

69. During the Class Period, VeriFone offered two credit card processing software products called PAYware Transact and PAYware Connect. A Software Support Engineer from July 2005 to August 2012 (CW8) was part of a small group that supported the installation and maintenance of PAYware Transact and PAYware Connect. CW8 did not go to the customers but provided support remotely by telephone and e-mail.

70. When CW8 first began working at VeriFone in July 2005, VeriFone marketed PAYware Transact to retail customers and charged them a one-time fee for the product of between $5,000 and $15,000, as well as a yearly software support payment that included VeriFone support 24 hours a day, 7 days a week. The annual software support payment amounted to 15 to 20% of the total cost of the software product. The PAYware Transact software could be used with VeriFone's credit card swiping terminal as well as terminals provided by other vendors. However, it was complex software that had a high up front cost for customers such as banks and retailers.

71. CW8 stated that VeriFone introduced PAYware Connect sometime in 2010. PAYware Connect offered a web-based method of credit card processing for customers at a much lower upfront cost and a monthly fee for transactions. This much more affordable software targeted smaller retail customers and other small business. Customers paid $15 to $25

for access to PAYware Connect, as well as a monthly fee per each transaction, which translated into monthly revenues for VeriFone.

72. Throughout 2011 and 2012, CW8 noticed a substantial drop in calls from customers for help with the PAYware Transact Software. "We just weren't getting any new customers," he said. Additionally, around August of 2012, CW8 learned that VeriFone was not meeting its credit card processing software sales goals. Shortly thereafter he was laid off and told that it was due to a "lack of work and reorganization" by the Company. While the PAYware Transact customers were disappearing and the PAYware Connect customers failed to materialize, defendant Bergeron was declaring the software products to be engines for growth.

73. On May 24, 2012, Defendant Bergeron stated that the POS mobile payments initiatives through Global Bay and PAYware Mobile enterprise also would likely be the third leg of an accelerating services story. He also stated:

> PAYware Connects rapid U.S. growth reflects our wide range of offerings to merchants of all sizes. Small merchants are selecting PAYware Mobile solutions for use with smartphones and tablets in their business. Large merchants are selecting PAYware for in-the-aisle check out and for solutions that are integrated with other retail systems.

74. Defendant Bergeron omitted to disclose that the PAYware business was not producing the growth and revenues that the Company had represented, instead portraying the business as an unmitigated success.

**H. VeriFone's Aggressive Forecasts Were Inconsistent With Its Collections and Cash Flow Travails**

75. The Global Collections Manager from August 2012 to June 2013 (CW9), stated that past due accounts amounted to "tens of millions of dollars" at the end of the quarters when he was employed. The past due accounts only increased with the Hypercom and Point acquisitions. CW9's supervisor, a Financial Director, was very concerned about the Company's finances and told CW9 towards the end of 3Q2012 and 4Q2012, "This is the first time that we have to report that we have a cash flow issue." He put enormous pressure on CW9 during these quarters to get the collections up so the Company could avoid disclosing the cash flow issue.

Defendants Bergeron and Dykes were aware of the collection issues because they received the weekly reports from the Financial Director.

## VI.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

76. The Class Period begins on December 14, 2011. On that date, VeriFone proclaimed "another year of record revenues and record profit" and its progress to becoming "the world's leading services-driven payment technology provider." The Company also proclaimed it was making significant progress in rationalizing "R&D investment." VeriFone's false statements and omissions about its ability to execute its plan to move to a more-subscription based model and its R&D investment continued through at least February 20, 2013. The following day, J.J.B. Hillard, W.L. Lyons LLC explained: "the lower than expected results and near term outlook is due in large part to the transitioning of the Company's business model from hardware sales to a payments-as-a service." On March 5, the Company admitted that its transformation to a services company was not properly balanced and executed and that its failure to adequately spend on R&D required certain customers to utilize pay solutions from VeriFone's competitors.

77. The false statements and omissions had a direct impact on the share price, which was trading in the range of $34 to $43 per share between December 2011 and January 2012, before climbing to $44+ from February 2012 through May 24, 2012. The price then dipped and hovered between $40 and $28 per share for the rest of the Class Period, closing at $31.89 during the final trading day before the truth was revealed. After disclosure of the previously unknown adverse facts, VeriFone's stock price closed at $18.24 per share.

### A. December 2011

78. On the first day of the Class Period, December 14, 2011, VeriFone issued a press release announcing its financial and operating results for the fourth quarter and fiscal year ended October 31, 2011. For the quarter, the Company reported net income of $199 million, or $1.84 diluted earnings per share ("EPS") and net revenue of $411 million, as compared to net income

of $49 million, or $0.55 diluted EPS and net revenue of $276 million for the same period a year ago. For the year, the Company reported net income of $282 million or $2.92 diluted EPS and net revenue of $1.3 billion, as compared to net income of $99 million, or $1.13 diluted EPS and net revenue of $1 billion for the same period a year ago. The press release quoted Bergeron as saying, "We finished 2011 with another year of record revenues and record profit, and are now midway through our multi-year transformation to the world's leading services-driven payment technology provider."

79. On the same day, the Company held a conference call with certain analysts, during which Defendant Bergeron stated:

> Now I want to provide a brief update on our M&A activities. I am very pleased with the dramatic progress we have made in our Hypercom integration activities. Our sales and marketing integration is complete**. We've made significant progress in improving the Hypercom supply chain and logistics model, and of rationalizing R&D investment for a combined company**. We have also driven synergies across the support functions, eliminating redundant positions and rolling IT applications into our existing VeriFone Oracle infrastructure.

Bergeron forecast a rapid transition from a hardware model to a services-based model: "We are on our way towards our goal of creating a services-based solutions business, with 50% services revenue by the end of fiscal year 2015." He also applauded the rapid integration of Hypercom's services business and focus on transitioning to a services business model:

> We completed a very complicated takeover of Hypercom, and then proceeded to rapidly integrate the business, and **we are already enjoying significant operating synergies**. We expect solid gross margin expansion from this additional business throughout 2012. **Our focus on services is reaping great rewards for our shareholders. Growth rates have accelerated, margins are expanding and we have developed unique advantages in our product portfolio, as they are increasingly bundled with encryption services, content and advertising, gateway services and cloud-based retail application processing.**

80. On December 23, 2011, the Company filed with the SEC its Annual Report on Form 10-K for the year ended October 31, 2011, which was signed by, among others, Defendants Bergeron and Dykes, and reiterated the Company's previously announced financial results and financial position. The 10-K also assured investors that the Company was sufficiently investing in R&D. "**We continue to devote research and development ("R&D") resources to address the market needs of both emerging and developed economies.**"

81. In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bergeron and Dykes, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

**B. <u>March – April 2012</u>**

82. On March 5, 2012, VeriFone issued a press release announcing its financial and operating results for the quarter ended January 31, 2012. For the quarter, the Company reported a net loss of $3 million, or ($0.03) diluted EPS and net revenue of $420 million, as compared to net income of $32 million, or $0.35 diluted EPS and net revenue of $284 million for the same period a year ago. Bergeron assured investors of the Company's ability to seamlessly transform itself into a subscription-based services business model: "The Point business is performing ahead of plan. The 'payment-as-a-service' model is positioned to serve as the new North American paradigm for quickly deploying and maintaining advanced EMV software and mobile wallet software updates for Visa, Isis, Google, PayPal and others."

83. On the same day, the Company held a conference call with securities analysts, during which Defendant Bergeron stated that the Company was "**picking up R&D investment**." He acknowledged that Hypercom had failed to invest in R&D for the eight or nine months prior to the acquisition by VeriFone. However, he stated that they have "been putting a lot of money in that" and "now these products are close to being shipped. We expect to sell a lot of them."

84. Defendant Bergeron also expressed faith in continued growth in services as a percent of revenue and service margins:

- "Even on a one-for-one basis, the economics of a mobile solution is much better for us than a recurring - - than a traditional terminal sale because the mobile software deliveries [*sic*] recurring revenue."
- "So I think services as a percent of revenue and services margins both are going to be continued highlights of the story over the next couple of years."
- "Due to the nature of the Point revenue model, with a heavy emphasis on recurring revenues through their all-in-one offering, we expect this monthly revenue to increase sequentially throughout the year."
- "And many of these services, I mentioned in the past calls, by their very nature have high incremental margins as you grow beyond kind of first day stuff. So I think services as a percent of revenue and services margins both are going to be continued highlights of the story over the next couple of years."

85. On March 12, 2012, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended January 31, 2012, which was signed by Defendants Bergeron and Dykes, and reiterated the Company's previously announced quarterly financial results and financial position. The 10-Q also assured investors that the Company was sufficiently investing in R&D. "**We continue to devote research and development ("R&D") resources to address the market needs of both emerging and developed economies.**"

86. In addition, the Form 10-Q contained signed certifications pursuant to the SOX by Defendants Bergeron and Dykes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

### C. May-June 2012

87. On May 24, 2012, VeriFone issued a press release announcing its financial and operating results for the quarter ended April 30, 2012. For the quarter, the Company reported net income of $15 million, or $0.13 diluted EPS and net revenue of $472 million, as compared to net income of $25 million, or $0.27 diluted EPS and net revenue of $292 million for the same period a year ago. Bergeron extoled the increase in revenue from the hardware-based Hypercom

products. “**We are very pleased with our performance, particularly the acceleration in organic growth and the increase in Hypercom-brand sales**. We remain confident in our outlook for the year.”

88. On the same day, during the Company’s analysts’ conference call Defendant Bergeron explained how the Company’s acquisition of Point demonstrated the success VeriFone would enjoy as it transforms to a subscriptions-based service model.

- “Well, as payment at the point-of-sale becomes more complex, Point has proven and other markets are begging for a services-based point-of-sale solution. So I think the transformation from – in many markets, from product sales to much more profitable and predictable services sales will be the leading driver.”

- “In Q2, we successfully closed 3 payment-as-a-service deals in our North American business as a first step in bringing the Point model to the U.S. This long-term, monthly recurring revenue offering includes the hardware, device management, security, encryption, help desk and a bulk of services.”

89. On June 11, 2012, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended April 30, 2012, which was signed by Defendants Bergeron and Dykes, and reiterated the Company’s previously announced quarterly financial results and financial position. The Company repeated its claim that it R&D expenditures were sufficient: “**We continue to devote research and development resources to address the market needs of both emerging and developed countries.**”

90. In addition, the Form 10-Q contained signed certifications pursuant to the SOX by Defendants Bergeron and Dykes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company’s internal control over financial reporting.

**D. <u>September 2012</u>**

91. On September 5, 2012, VeriFone issued a press release announcing its financial and operating results for the quarter ended July 31, 2012. For the quarter, the Company reported net income of $38 million, or $0.34 diluted EPS and net revenue of $489 million, as compared to

net income of $26 million, or $0.28 diluted EPS and net revenue of $317 million for the same period a year ago. Bergeron affirmed the positive status of VeriFone's transition to a services-based company. "In the U.S. growth accelerated as we saw the beginnings of the adoption of EMV-based systems and the first significant payments services deals in the quarter. We are excited about our prospects for 2013 and beyond."

92. Bergeron's optimism continued during the Company's quarterly analyst conference call held on the same day.

- "The deployment of the payment-as-a-service, all in one model, across Point's home markets continues to be extremely successful."
- "The installed base of payment-as-a-service solutions has grown 22% compared to a year ago and 12% since the day the [Point] acquisition closed."
- "Sequential improvement in service gross margins primarily reflects increased services revenue with a favorable mix towards service offerings that provide us with higher incremental margins, such as Point."
- "We're making great strides in the conversion of VeriFone into the world's premier software and services platform for mobile payments, card payments and security."
- "Looking forward to 2013, we see another fantastic year of revenue growth and accelerated earnings and cash flow growth resulting from expanding margins, a deleveraging balance sheet and continued success with our software and services initiatives."
- "So we not only have financially strong results in our North America segment, our backlog of services business in deferred revenue is growing quite strongly as well."
- "We're focused on everything everywhere around services. Our general managers, our salespeople are compensated to turn what would be a complicated product sale into a more complicated services sale. It does provide a little bit of a headwind on revenue growth. **I think we can manage through that**. But we're out trying to solve problems for retailers who are trying to reinvent themselves, become PCI and EMV compliant, run these mobile wallets. And my sense is the more complexity that's out there, the more of an

opportunity will be for us to not sell devices, but services. **In the developing world where product sophistication is much lower throughout Asia, Latin America, certainly Sub-Sahara Africa, we'll still continue to sell boatloads of products versus services, and hence, that's why we still think there'll be a lot of products in our business."**

93. On September 10, 2012, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended July 31, 2012, which was signed by Defendants Bergeron and Dykes, and reiterated the Company's previously announced quarterly financial results and financial position. The Company again communicated that it had made sufficient R&D investment. "**We continue to devote research and development ("R&D") resources to address the market needs of both emerging and developed economies.**"

94. In addition, the Form 10-Q contained signed certifications pursuant to the SOX by Defendants Bergeron and Dykes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

**E. <u>December 2012</u>**

95. On December 13, 2012, the Company announced financial and operating results for the fourth quarter and fiscal year ended October 31, 2012. For the quarter, the Company reported net income of $27 million, or $0.24 diluted EPS and net revenue of $485 million, as compared to net income of $199 million, or $1.84 diluted EPS and net revenue of $411 million for the same period a year ago. For the year, the Company reported net income of $65 million, or $0.59 diluted EPS and net revenue of $ l.9 billion, as compared to net income of $282 million or $2.92 diluted EPS and net revenue of $1.3 billion for the same period a year ago.

96. The Company also announced its guidance for 1Q2013 for non-GAAP revenue to be between $490 million and $500 million, assuming current exchange rates, and non-GAAP earnings per share to be in the range of $0.70 to $0.73. For fiscal year 2013, the Company confirmed its guidance for non-GAAP revenue of $2.05 billion to $2.1 billion and non-GAAP earnings per share in the range of $3.25 to $3.30.

97. During the analysts' conference call that day, Bergeron cheered the progress of transitioning to a services business model.

- "The aggregate cost of these investments is approximately $4 million in operating expense per quarter. We expect to see the fruits of our labor beginning in the second half of 2013 and a material positive impact on growth rates and margins in 2014. All of these initiatives are being rolled out as managed services and towards our goal of transforming our business model. We believe we can repeat the success we have seen in North America throughout all of VeriFone."
- "As a reminder, the all-in-one business, which bundles systems in a suite of software services into a multiyear contract, increases overall revenue significantly over the life of the contract but defers revenue over many quarters rather than generating an immediate benefit."
- "Our goal for 2013 is to step up R&D and channel investments to clone our GlobalBay, taxi, LIFT Retail and Point businesses for deployment in several other key international markets where we have expandable infrastructure, a strong and established brand and sold macro growth fundamentals."
- "We will see higher R&D and channel investments than in previous years in order to set up our international markets for rapid Point, GlobalBay and taxi revenue growth in the second half of 2013 and 2014."

98. He also assured investors that despite its outstanding bottom line growth, **VeriFone did "not sacrifice[] strategic investments for the sake of the bottom line."**

- "The foundations built in 2012 will drive continued outsized returns for our shareholders in 2013 and beyond."
- "Service margins are the ones that we said we'll continue to grow, I think, unidirectionally. And as long as services margins are growing - - services revenue is growing faster than product revenue, it will have a positive impact on average gross margins."

- "Product margins will stay around where they are, 43%, 44%. I think systems margins should continue their incremental improvement throughout the year just because they're a high fixed cost, low variable cost business."

99. During the question and answer portion of the analyst call, Bergeron was evasive when asked about what impact the transition from product sales to integrated services sales would have on the bottom line:

> Darrin D. Peller – Barclays Capital, Research Division: All right. So then, basically, I don't know exactly what the number would have been or would be in the next year or so in terms of what it would grow if you weren't going through this conversion. Is it a couple of basis points higher in the top line? And then I'm assuming this also is pretty contributory to your margins. I mean, can you just give us a little more granularity on both of those numbers, if you know them at least?
>
> Defendant Bergeron: I don't have it, and I wouldn't want to mislead you. We know it's real, taking deferred revenue versus onetime revenue impacts short-term revenue. But we know from looking at the before and after from Point internally, they had tremendous margins expansion. And eventually, you kind of catch up with the deferral of the revenue and you resume your growth rate."
>
> ***
>
> Wayne Johnson – Raymond James & Associates, Inc., Research Division: Just a couple of quick questions here. Most of mine have been addressed. But if I just took on the reported revenue line, system solutions, by far, the dominant contributor to your Q, that was above our plan. And I was wondering if you could just talk a little bit about the organic revenue growth outlook for POS, in particular, and how we should think about that going forward. And then I have a follow-up.
>
> Defendant Bergeron: I mean, we went to great lengths to not only provide Wayne, organic revenue projections. We even gave you organic guidance per region. I think you see . . .
>
> Wayne Johnson: Right, but I'm parsing out - - I apologize for interrupting your answer. I am trying to parse out the service from the hardware on a geographic basis.
>
> Defendant Dykes: The bulk of what we were talking about when we gave you those growth rates is really a reflection of POS-

> type business. Clearly, we've included in that the fact that there will be some - - a weakening of the straight POS business as we move to the services business with the Point model, et cetera. But we don't want to literally break it out because we're still evolving in those other markets. And so I think it's better just to stick with the total growth of the business - - by the geographical area and know that if all things were equal, if we weren't trying to grow our Point business, the POS business will grow a bit stronger than that. But we have included in there a bit of weakness in the POS business as we grow the service. . . .
>
> Defendant Bergeron: Well, it's a weakness in reported revenues from systems, it's not a weakness in customer attachment, which comes vis-à-vis the services contracts.
>
> Defendant Dykes: That's what I am trying to say. It's a lower growth than in other ways it would have been. And we reflected that in those numbers.

100. On December 19, 2012, the Company filed its Annual Report on Form 10-K with the SEC for the year ended October 31, 2012, which was signed by, among others, Defendants Bergeron and Dykes, and reiterated the Company's previously announced financial results and financial position. The Company continued its refrain that it was sufficiently investing in R&D. "**We continue to devote research and development resources to address the market needs of both emerging and developed economies.**"

101. In addition, the Form 10-K contained signed certifications pursuant to the SOX by Defendants Bergeron and Dykes, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

102. The statements referenced in ¶¶76-101 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) the Company had not sufficiently maintained R&D spending in the hardware portion of the business, causing significant delays in certification of products resulting in a material loss of market share; (ii) the Company painted a picture of a smooth transition to a service-based business, failing to disclose that the transition from a hardware-centric model to a services-based business required

the Company to go through several quarters of lowered profitability to get the right services and hardware products mix; (iii) the Company lacked adequate internal and financial controls and recorded revenue improperly; and (iv) the revenue guidance for the first quarter of 2013 was provided without a reasonable basis and was known to be unreliable.

## VII.

## THE TRUTH BEGINS TO EMERGE

103. Each of the foregoing statements made throughout the Class Period were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, status and its prospects and performance.

104. VeriFone's misrepresentations about its inadequate R&D expenditures and its ability to smoothly grow services revenue without sacrificing a material amount of hardware revenue and market share, were ongoing and occurred with the knowledge, acquiescence and direct participation of the Individual Defendants. If the truth about the status of Defendants' business and future prospects had been known, VeriFone's stock would have traded at lower prices.

105. On February 4, 2013, the Company disclosed the "retirement" of Defendant Dykes. On this news, VeriFone's shares declined $0.87 per share or nearly 2.5%, to close at $34.37 per share on February 4, 2013.

106. On February 20, 2013, after the market closed, the Company issued a press release announcing preliminary financial results for the first fiscal quarter ended January 31, 2013. The Company disclosed revenues of $424-$428 million, compared to analysts' average estimate of $492 million, representing the first time in two years that the Company failed to beat analysts' estimates. The press release stated the following, in relevant part:

> VeriFone expects to report Q1 non-GAAP net revenues in the range of $425 million to $430 million and Q1 GAAP net revenues in the range of $424 million to $428 million. VeriFone expects to report non-GAAP net income per share between $0.47 and $0.50 and GAAP net income per share between $0.07 and $0.10.
>
> According to the Company, the lower than expected results for the first quarter were driven primarily by:

- Continued weak macro-economic conditions in Europe;
- Increased focus and investments throughout 2012 on longer-term service initiatives in multiple jurisdictions at the expense of near-term hardware and software features and customization projects that were reduced or delayed, which resulted in missed revenue opportunities;
- An increase in deferred revenue related to volume shipments made during the quarter to a new mix of customers in the Middle East and Africa. These shipments did not meet first quarter revenue recognition requirements;
- Lower than anticipated revenue from large Brazilian customers, as well as political and economic uncertainty in Venezuela, typically a strong market for VeriFone; and
- Several customers electing to delay major projects beyond the first quarter, as well as the cancelled Washington, D.C. taxi project.

> "During the first quarter we faced a number of external headwinds and internal challenges, which impacted our results," said Douglas G. Bergeron, Chief Executive Officer. "While we are disappointed with our performance and execution, we have a firm grasp on the challenges we faced and are taking aggressive steps to strengthen our competitiveness over the long-term. Although the focus on our services efforts impacted some local software and hardware modifications that were required to be competitive, our product platform and architecture are consistently recognized by the industry as being best in class. We are confident in our ability and committed to executing against our strategic priorities to drive shareholder value."

The company is executing steps to address the current challenges, including:

- Conducting a comprehensive review of VeriFone's strategic operating plan to ensure near-term product priorities are provided for, even as the company continues to increase its services offerings.
- Increasing management focus and R&D investment on product development and certifications to accelerate the release of in-demand products throughout fiscal 2013; and
- Driving cost efficiencies, including streamlining and better integrating recently completed acquisitions.

107. Analysts were immediately alarmed by the disappointing results, voicing strong skepticism regarding the Company's explanations for the decline. Reuters published a news article entitled, "VeriFone shares nearly halve, analysts query management." The article stated the following in relevant part:

> VeriFone shares slid to $17.93, their lowest in nearly three years, and at least seven analysts cut their price targets on the stock. **Deutsche Bank, in a client note, said the company had finally admitted it had failed to execute on its plans to move to a more subscription-based service model.**
>
> Several analysts suggested that VeriFone's new chief financial officer had taken a more conservative accounting approach at the company, which already faces a court case for a past accusation of reckless accounting.
>
> The company will likely be sold, SunTrust Robinson Humphrey analyst Andrew Jeffrey wrote in a note, cutting his rating on the stock to "neutral" from ''buy."
>
> "Management credibility has been lost," he said. "Market share losses are deeper and more persistent than we had previously believed."
>
> "We believe VeriFone will be acquired before it completes its business model transition.''
>
> * * *
>
> The company might have been aggressively shifting to services from hardware sales and the management took its eye off the ball in terms of product evolution, allowing rival Ingenico SA to take market share, analysts said.
>
> * * *
>
> Deutsche, which rates the stock a "sell", slashed its price target to $15 from $27. The brokerage said past acquisitions had masked what was happening at the company and that it had long been wary of its "aggressive accounting recognition."
>
> "The recent CFO retirement/resignation and the first-quarter revenue recognition requirements could also suggest accounting red flags in prior quarters," Deutsche said, noting the latest quarter's accounts had been signed off by the new CFO.
>
> * * *
>
> Analysts on Thursday rejected the company's argument that its problems came from the weak economy. While macro conditions may have had an impact on business in the quarter, the global

> economy has had far less of an impact on peers such as NCR Corp. and Micros Systems, said Wedbush analyst Gil Luria, who cut his price target to $22 from $33.
>
> Citi Research analyst Philip Stiller cut his rating on the stock to "neutral" from "buy" and price target to $23 from $47.
>
> "(VeriFone) has a long uphill battle to rebuild trust and belief in the company on top of ongoing execution issues in a rapidly changing payments landscape," he said in a note.
>
> VeriFone warned late on Wednesday that it expected its first quarter-adjusted earnings to be 47 to 50 cents per share on revenue of $424 million to $428 million. That is well short of the average analyst profit forecast of 73 cents per share on revenue of $492 million.
>
> The company forecast an adjusted profit of 45 to 50 cents per share in the current quarter, well below the average analyst forecast of 80 cents, according to Thomson Reuters I/B/E/S.

108. Echoing this shock, PiperJaffray downgraded the stock to Neutral from Overweight and reduced its price target to $24 from $42. PiperJaffray noted from its discussions with management that the Company "believes it over-emphasized the services business to the detriment of the systems (hardware) business. This created a serious air pocket for sales activity."

109. Similarly, an article on the website of Seeking Alpha entitled, "VeriFone Now a Falling Knife" noted that management's explanations for the shortfall were not plausible, pointing to potential accounting manipulations. The article stated the following in relevant part:

> VeriFone management seems to appreciate that results like these require some explanation, but I'm not entirely sure I accept the reasons they've offered.
>
> Management mentioned weak conditions in Europe. Fair enough - we all know that conditions in Europe are pretty tough. Buy why, then, is Europe-based Ingenico not seeing the same trouble?
>
> VeriFone management also talked about a new accounting policy regarding revenue recognition that meant revenue from new distributors in the Mideast and Africa was not recognized this quarter. With a new CFO on board that, too, is a credible explanation. Unfortunately, it also feeds into one of the more persistent bear stories about VeriFone - that the company has been a little too aggressive with its accounting in the past (including its

> calculation of organic growth). If management was overstating past revenue growth, that could explain why the business has seemingly hit such a hard wall now.
>
> Other, more routine, business issues also factored into the miss. The Company saw its Washington D.C. taxi project go up in smoke, and revenue from Brazil was weaker than expected.
>
> Last and not least were management's acknowledgments of operational errors. In particular, it sounds like the company made some meaningful mistakes on system upgrades with customers. At the same time, the company appeared to drop the ball on the hardware side of the business, losing share to Ingenico in the process.
>
> * * *
>
> At the same time, a couple of large recent acquisitions haven't really added a lot of value. Not only has the company not seen a major pick up in revenue (which really wasn't the expectation at this point in the process), but it looks like the process of integrating the deals and realizing synergies has not gone as well as hoped. Here again, then, we have a direct potential issue with management's ability to execute and operate.

110. On the February 20, 2013 news, VeriFone's stock declined $13.65 per share or nearly 43%, to close at $18.24 per share on February 21, 2013.

## VIII.

## <u>LOSS CAUSATION</u>

111. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class. VeriFone's disclosures of previously misrepresented and concealed facts about its ability to sustain its financial results, particularly with respect to its ability execute its plan to move to a subscription-based service model and its investment in product R&D, caused the price of VeriFone stock to decline $13.65 per share, or 43%, wiping out hundreds of millions of dollars of shareholder value.

112. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of VeriFone stock and operated as a fraud or deceit on purchasers of VeriFone stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and

fraudulent conduct were disclosed and became apparent to the market, the price of VeriFone stock declined significantly, as the prior artificial inflation came out of VeriFone's share price.

113. The declines in the price of VeriFone stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in VeriFone's stock negate any inference that the losses suffered by Lead Plaintiffs and the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

114. During the Class Period, Lead Plaintiffs and the Class purchased VeriFone stock at artificially inflated prices and were damaged when the price of VeriFone stock declined when the truth was revealed, and/or the information alleged herein to have been concealed from the market was revealed, causing investors' losses. Specifically, VeriFone's stock declined dramatically on February 4, 2013 and February 20, 2013 when the Company disclosed that: (1) Dykes was "retiring" from the Company, and (2) the preliminary results for 1Q2013 results and preliminary guidance for 2Q2013 were materially below the Company's guidance and analysts' expectations.

115. Throughout the Class Period, Defendants made materially false and misleading statements and omissions concerning the status of the Company's business and its ability to sustain its financial success and growth. In particular, Defendants made materially false and misleading statements and omissions regarding (1) the Company's transition from a hardware-centric model to a services-based business; (2) allocation of R&D resources for product customization localization, and certification; and (3) improper revenue recognition. For instance, during the Company's May 24, 2012 conference call with analysts and investors, Defendant Bergeron trumpeted the Company's "transformation from products to much more profitable services sales." On September 5, 2012, Defendant Bergeron maintained his confidence, stating, "We're making great strides in conversion of VeriFone into the world's premier software and services platform." And in each of its quarterly filings, it assured the investing community that it devoted sufficient R&D resources to meet the market needs. It was not until February 2013 that

investors realized the full extent and magnitude of VeriFone's concealment of the truth. Had the Defendants been truthful about these matters throughout the Class Period, Lead Plaintiff and the Class would not have purchased VeriFone stock, or would not have purchased the stock at artificially inflated prices.

116. As a direct result of Defendants' misrepresentations and omissions of material facts, the price of VeriFone stock was artificially inflated throughout the Class Period. This artificial inflation was removed from the price of VeriFone stock as the truth about VeriFone's inability to seamlessly transition the Company's business model from hardware sales to a payment-as-a-service model, insufficient and misallocated R&D expenditures; and improper revenue recognition, were disclosed. The price of VeriFone stock declined in response to news correcting Defendant's Class Period misstatements and omissions.

117. On February 20, 2013, VeriFone announced its preliminary 1Q2013 results. VeriFone reported that it would miss its revenue guidance by more than $60-65 million. On this news, VeriFone's stock price plunged $13.65, or nearly 43% to close at 18.24 per share on February 21, 2013. More than 50 million shares traded that day. In comparison, the number of shares traded on February 19, was just over 1.9 million. In the period February 11-15, 2013, VeriFone's total trading volume was nearly 11 million shares.

118. It was entirely foreseeable to Defendants that misrepresenting and concealing from the public, *inter alia*: (i) failures in the Company's transition to a service based business at the immediate expense of hardware sales; (ii) misallocation of the Company's investment in R&D and its resulting inability to customize and localize products; and (iii) improper revenue recognition, would lead to a decline in the value of VeriFone common stock upon revelation of the true facts. It was also foreseeable that the ultimate disclosures of this information, and the materialization of the concealed risks created by VeriFone's aforementioned conduct, would cause the price of VeriFone stock to decline as the inflation caused by VeriFone's earlier materially false and misleading statements and omissions of material fact was removed from the stock price. Accordingly, the conduct of Defendants as alleged herein proximately caused

foreseeable losses to Lead Plaintiffs and the Class who purchased or otherwise acquired VeriFone common stock during the Class Period.

**IX.**

## NO SAFE HARBOR

119. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.

**X.**

## CLASS ACTION ALLEGATIONS

120. Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on their own behalf and on behalf of a class consisting of all persons or entities who purchased or otherwise acquired VeriFone common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are the Defendants, officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

121. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period VeriFone's common stock was actively traded on the NYSE, an efficient market. While the exact number of Class members is unknown to Lead

Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by VeriFone or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions. As of August 30, 2013, there were 109,236,844 shares of VeriFone common stock outstanding.

122. Lead Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct as alleged herein which violated federal law.

123. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

124. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public and the analyst community during the Class Period misrepresented material facts about the business of VeriFone, including its revenues, R&D expenditures and transition to a service based business model, as well as the operations and management of VeriFone;

(c) Whether the Defendants acted knowingly or with reckless disregard for the truth in misrepresenting material facts;

(d) Whether the market price of VeriFone common stock during the Class Period was artificially inflated due to the material misrepresentations and omissions complained of herein; and

(e) To what extent the members of the Class have sustained damages and the proper measure of damages.

125. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this lawsuit as a class action.

126. As for claims made by Lead Plaintiffs on behalf of the Class under Section 10(b) of the Exchange Act, Lead Plaintiffs rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine. The market for VeriFone common stock was at all times an efficient market during the Class Period for the following reasons, among others:

(a) VeriFone's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market during the Class Period;

(b) During the Class Period, on average, millions of shares of VeriFone common stock were traded on a weekly basis, demonstrating a very active and broad market for VeriFone common stock and permitting a very strong presumption of an efficient market;

(c) As a regulated issuer, VeriFone filed periodic public reports with the SEC during the Class Period;

(d) VeriFone regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications at investor conferences, with the financial press and other similar reporting services;

(e) VeriFone was followed by several securities analysts employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. These companies include, but are not limited to Barclays Capital, Inc., Citigroup Inc., Compass Point Research & Trading LLC, Deutsche Bank Securities Inc., Goldman Sachs Group, Inc., J.J.B. Hilliard, W.L. Lyons, LLC,

J.P. Morgan Chase & Co., Jeffries Global Research and Strategy, Morgan Keegan & Company, Inc., Northcoast Research, Piper Jaffray, Raymond James & Associates, Inc. RBC Capital Markets, SunTrust Robinson Humphrey, Inc., Susquehanna Financial Group LLLP and Wedbush Securities Inc. These entities issued research reports and/or comments on VeriFone during the Class Period based on information obtained from the Company and the Individual Defendants, which impacted the market price of VeriFone's common stock. Information from each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about VeriFone was rapidly reflected and incorporated into the Company's stock price during the Class Period.

127. As a result of the foregoing, the market for VeriFone's common stock promptly digested current information regarding VeriFone from all publicly available sources and reflected such information in VeriFone's stock price. Under these circumstances, all purchasers of VeriFone's common stock during the Class Period suffered similar injury through their purchase of VeriFone's common stock at artificially inflated prices, and a presumption of reliance applies.

## XI.

## FIRST CLAIM

## Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

128. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

129. This claim is brought against VeriFone and the Individual Defendants.

130. As set forth above, during the Class Period, VeriFone and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (2) cause Lead Plaintiffs and other members of the Class to purchase VeriFone's common stock at artificially inflated prices. In furtherance of this

unlawful scheme, plan and course of conduct, VeriFone and the Individual Defendants, and each of them, took the actions set forth herein.

131. VeriFone and the Individual Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for VeriFone's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. VeriFone and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged herein.

132. VeriFone and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, status, and future prospects of VeriFone as specified herein.

133. VeriFone and the Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of VeriFone's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about VeriFone and its business operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of VeriFone's common stock during the Class Period.

134. Each of the Individual Defendants' primary liability, and control person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's

management team or had control thereof; (2) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

135. VeriFone and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing VeriFone's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by the Individual Defendants' misstatements regarding the Company's business throughout the Class Period, such Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

136. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of VeriFone's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of VeriFone's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by VeriFone and the Individual Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by such Defendants but not disclosed in public statements by them during the Class Period, Lead

Plaintiffs and the other members of the Class acquired VeriFone common stock during the Class Period at artificially inflated prices and were damaged thereby.

137. At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding VeriFone's financial results, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased their VeriFone common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

138. By virtue of the foregoing, VeriFone and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

139. As a direct and proximate result of such Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

140. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiffs' purchases of common stock giving rise to the cause of action.

**XII.**

**SECOND CLAIM**

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

141. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

142. The Individual Defendants acted as controlling persons of VeriFone within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the misleading financial information disseminated by the Company to the investing public including with regard to the status of its transition from a hardware-centric model to a services-based business and its impact on the

Company's financial results, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. The Individual Defendants had the ability to prevent the issuance of the statements alleged to be false or misleading or cause them to be corrected.

143. Each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and disclosures giving rise to the securities violations as alleged herein, and exercised the same.

144. As set forth above, VeriFone and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

145. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of such Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

146. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiffs' purchases of common stock giving rise to the cause of action.

## XIII.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

(a) That the Court determine that this action is a proper class action and certifying Lead Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) That the Court award compensatory damages in favor of Lead Plaintiffs and the other Class members as appropriate against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) That the Court Award Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) That the Court award such other and further relief as the Court may deem just and proper.

**XIV.**

**JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury.

Dated: December 16, 2013

GOLD BENNETT CERA & SIDENER LLP

/s/Thomas C. Bright
Thomas C. Bright

Attorneys for Lead Plaintiffs

**CERTIFICATE OF PLAINTIFF**

I, Bernard Selz, on behalf of the beneficiaries of my trust account for which I serve as trustee, the beneficiaries of Selz Family 2011 Trust for which I am grantor, Karnak Partners L.P. ("Karnak"), for which I am the managing member of the General Partner, and Ermitage Selz Fund Ltd. ("Ermitage") and GAM Selection Hedge Investments Inc. ("GAM"), for which I serve as director (Karnak, Ermitage and GAM collectively "The Funds"), hereby certify that:

1. I am the portfolio manager of The Funds. I am familiar with the matters set forth herein and am duly authorized to make this Certification on behalf of The Funds.

2. I have reviewed a complaint prepared by The Funds' attorneys, Gold Bennett Cera & Sidener LLP, and The Funds agree to be a representative plaintiff in this action.

3. The Funds did not purchase VeriFone Systems, Inc. ("VeriFone") securities that are the subject of the complaint at the direction of counsel or to participate in any private action arising under the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

4. The Funds are willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary. The Funds understand the duties and responsibilities of a class representative, including overseeing the prosecution of the action for the Class.

5. I have reviewed the records of The Funds' transactions in VeriFone securities. The Funds purchased and/or sold VeriFone securities in the amounts and on the dates identified in the attachment hereto.

**[SEE ATTACHED SCHEDULE]**

6. In the three years preceding the date of this certificate, The Funds have not sought to serve as a representative party on behalf of a class in an action brought under the federal securities laws.

7. The Funds will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the Class and The Funds' activities in the lawsuit, as ordered or approved by the Court.

8. Nothing herein shall be construed to be or constitute a waiver of The Funds' attorney-client privilege.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on May 6, 2013.

Bernard Selz

Bernard Selz Revocable Trust, Trustee
Selz Family 2011 Trust, Grantor
Karnak Partners, L.P., Managing Member of
General Partner
Ermitage Selz Fund Ltd., Director
GAM Selection Hedge Investments Inc., Director

SELZ ACCOUNTS HOLDING IN PAY

| **VERIFONE SYSTEMS INC** | 92342Y109 | | | | |
|---|---|---|---|---|---|
| **PURCHASES BETWEEN 12/14/11 - 2/4/13** **Family Name** | **Open Date** | **Tax Lot** | **Total** | **Unit Cost (Base)** | **Total Cost (Base)** |
| SELZ FAMILY 2011 TRUST | 2012-07-26 | 26,000 | | 35.46 | 921,863.80 |
| SELZ FAMILY 2011 TRUST | 2012-09-05 | 74,000 | 100,000 | 31.74 | 2,349,026.40 |
| | | | | | |
| KARNAK PARTNERS LP | 2012-07-13 | 21,000 | | 36.25 | 761,166.00 |
| KARNAK PARTNERS LP | 2012-07-16 | 8,000 | | 36.05 | 288,370.40 |
| KARNAK PARTNERS LP | 2012-07-17 | 9,000 | | 35.63 | 320,700.60 |
| KARNAK PARTNERS LP | 2012-07-18 | 17,000 | | 36.29 | 617,004.80 |
| KARNAK PARTNERS LP | 2012-07-26 | 20,000 | | 35.11 | 702,295.00 |
| KARNAK PARTNERS LP | 2012-08-02 | 8,000 | | 35.92 | 287,324.00 |
| KARNAK PARTNERS LP | 2012-09-06 | 14,000 | | 32.03 | 448,362.60 |
| KARNAK PARTNERS LP | 2012-09-07 | 16,000 | | 31.24 | 499,881.60 |
| KARNAK PARTNERS LP | 2012-10-16 | 56,000 | | 32.23 | 1,804,924.80 |
| KARNAK PARTNERS LP | 2012-11-06 | 25,000 | 194,000 | 32.58 | 814,622.50 |
| | | | | | |
| ERMITAGE SELZ FD LTD | 2012-07-13 | 19,000 | | 36.25 | 688,674.00 |
| ERMITAGE SELZ FD LTD | 2012-07-16 | 8,000 | | 36.05 | 288,370.40 |
| ERMITAGE SELZ FD LTD | 2012-07-17 | 7,000 | | 35.63 | 249,433.80 |
| ERMITAGE SELZ FD LTD | 2012-07-18 | 15,000 | | 36.29 | 544,416.00 |
| ERMITAGE SELZ FD LTD | 2012-07-26 | 20,000 | | 35.11 | 702,295.00 |
| ERMITAGE SELZ FD LTD | 2012-08-02 | 8,000 | | 35.92 | 287,324.00 |
| ERMITAGE SELZ FD LTD | 2012-09-06 | 10,000 | | 32.03 | 320,259.00 |
| ERMITAGE SELZ FD LTD | 2012-09-07 | 16,000 | | 31.24 | 499,881.60 |
| ERMITAGE SELZ FD LTD | 2012-10-16 | 46,000 | | 32.23 | 1,482,616.80 |
| ERMITAGE SELZ FD LTD | 2012-11-06 | 17,000 | 166,000 | 32.58 | 553,943.30 |
| | | | | | |
| GAM SELECTION HDG INVTS INC | 2012-07-13 | 10,000 | | 36.25 | 362,460.00 |
| GAM SELECTION HDG INVTS INC | 2012-07-16 | 4,000 | | 36.05 | 144,185.20 |
| GAM SELECTION HDG INVTS INC | 2012-07-17 | 4,000 | | 35.63 | 142,533.60 |
| GAM SELECTION HDG INVTS INC | 2012-07-18 | 8,000 | | 36.29 | 290,355.20 |
| GAM SELECTION HDG INVTS INC | 2012-07-26 | 10,000 | | 35.11 | 351,147.50 |
| GAM SELECTION HDG INVTS INC | 2012-08-02 | 4,000 | | 35.92 | 143,662.00 |
| GAM SELECTION HDG INVTS INC | 2012-09-06 | 6,000 | | 32.03 | 192,155.40 |
| GAM SELECTION HDG INVTS INC | 2012-09-07 | 8,000 | | 31.24 | 249,940.80 |
| GAM SELECTION HDG INVTS INC | 2012-10-16 | 28,000 | | 32.23 | 902,462.40 |
| GAM SELECTION HDG INVTS INC | 2012-11-06 | 8,000 | 90,000 | 32.58 | 260,679.20 |
| | | | | | |
| BERNARD SELZ *(transferred to Revocable Trust)* | 2012-09-05 | 100,000 | 100,000 | 31.74 | 3,174,360.00 |
| | | | | | |
| | | **650,000** | **650,000** | | |
| | | | | | |